UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FRANK S.,

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

**MEMORANDUM & ORDER**
23-CV-03187 (HG)

**HECTOR GONZALEZ**, United States District Judge:

In this appeal brought pursuant to the Social Security Act, 42 U.S.C. § 405, Plaintiff Frank S.[1] challenges the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. The parties have filed cross-motions for a judgment on the pleadings. ECF No. 10-1 (Plaintiff's Motion); ECF No. 13-1 (Commissioner's Motion). For the reasons set forth below, the Court grants the Commissioner's motion and denies Plaintiff's motion.

## BACKGROUND

Plaintiff has worked as a police officer since 1992 and alleges disability starting March 27, 2020, because of several ailments including: "COVID-19"; "psychosis"; "memory loss"; "anxiety"; and "paranoia." *See* ECF No. 7 at 90–91, 265 (Administrative Record; "AR").[2]

---

[1]     This is a redacted version of the Court's Memorandum and Order, which was initially made available only to the parties on November 20, 2024. The Court previously provided both parties the opportunity to seal portions of this Order. Plaintiff filed no response. In view of the nature of this case, and as recommended by Defendant, Plaintiff's name has been partially redacted on the docket and in this Order, consistent with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2]     Citations to ECF cite to the pages assigned by the Electronic Case Files System. Citations to AR cite to the pages assigned by the Administrative Record.

A. *Medical History and Opinion Testimony*

In April 2020, Plaintiff was hospitalized for three weeks following multiple visits to the emergency room due to psychotic behavior and attempted suicide. *Id*. at 319, 386–90. Plaintiff presented to the emergency room with "mutism" and reported that he had been "slightly off" since March 26, 2020, and had been "making vague paranoid statements such as saying he caused the coronavirus pandemic, but the complete mutism was new." *Id*. at 314. Plaintiff was treated at the in-patient psychiatric ward of Stony Brook Hospital from April 16, 2020, to May 8, 2020, for major depressive disorder. *Id*. at 378. During his stay, Plaintiff was treated with several sessions of electroconvulsive therapy, as well as psychotropic medication. *Id*. at 384, 398. At Stony Brook, Plaintiff showed improvement in mood, less anxiety, and no delusions or hallucinations. *Id*. at 384. Following discharge from the hospital, Plaintiff was treated by Dr. Tamir Aldad through an outpatient program at Mather Memorial Hospital. *Id*. at 403–06. Dr. Aldad evaluated Plaintiff on May 14, 2020, and noted Plaintiff's diagnosis as "[b]rief reactive psychosis with marked stressor" but also observed organized thought processes with relevant content, adequate judgment and attention, and intact memory. *Id*. at 404. On May 22, 2020, Plaintiff met with treating therapist Robin Lisanti and expressed to her that he was in a very good mood with no depression and that he felt ready for discharge from the program. *Id*. at 422–26.

Following discharge from the outpatient program, Plaintiff met with psychiatrist Dr. Benjamin DeLucia on June 10, 2020, reporting that he had no paranoia, was sleeping well, and had no suicidal or homicidal ideation. *Id*. at 431–34. Dr. DeLucia also noted that Plaintiff "present[ed] as psychiatrically stable." *Id*. On July 22, 2020, treating psychologist Dr. Andrew Deptula completed a medical source statement. It was Dr. Deptula's opinion that Plaintiff's hospitalization appeared to be "the result of COVID-19 induced delirium," and while the acute

2

neuropsychiatric problems associated with the illness had resolved, Plaintiff continued to suffer "short-term memory loss and significantly increased levels of anxiety that are a result of the illness." *Id*. at 442.  Dr. Deptula also deemed Plaintiff "disabled to be a police officer due to [the possibility of] contracting COVID-19 at work." *Id*.

Treating psychologist Dr. Joseph Fischetti submitted a letter on December 18, 2020.  In the letter, Dr. Fischetti explained that he met with Plaintiff and his wife on a weekly basis via videocall and that Plaintiff was making "appropriate, manageable and predictable adjustment to his activities of daily living with no demonstrable behaviors or concerns." *Id*. at 457–58.  However, Dr. Fischetti recommended against Plaintiff returning to his former profession as a police officer. *Id*.  On January 26, 2021, Plaintiff again met with Dr. DeLucia and reported a stable mood, that there had not been a reoccurrence of any symptoms, that he was active and working out, and that he was engaged in family life. *Id*. at 795.  At another appointment with Dr. Deptula in June 2021, Plaintiff reported that he was not worried as much as he used to be about being in public and even played in a softball league game. *Id*. at 771.  On August 30, 2021, Plaintiff reported continued anxiety about being around people to Dr. Deptula but was otherwise in "better spirits." *Id*. at 775.  At the administrative hearing Plaintiff requested after his application for disability benefits was denied, Plaintiff testified that the police department had taken away his gun and that he could no longer work as a police officer due to his anxiety, difficulty dealing with the public, and fear of COVID-19. *Id*. at 47.  Plaintiff also testified that he was prescribed Sertaline, Clonazepam, Trazadone, and Olanzapine. *Id*.  Plaintiff's wife testified at the same hearing that her husband suffered from paranoia, so much so that he thought a man repairing a neighbor's sprinkler system was responsible for bringing COVID-19 to the world. *Id*. at 59.

3

B. *Procedural History*

On July 21, 2020, Plaintiff filed an application for disability benefits and his application was initially denied on February 3, 2021, and again upon reconsideration on April 22, 2021. *Id.* at 16. Plaintiff requested a hearing, and an administrative hearing was held before Administrative Law Judge April M. Wexler (the "ALJ") via teleconference on December 10, 2021. *Id.* The ALJ issued a decision on February 2, 2022, finding Plaintiff not disabled. *Id.* at 16–31. The Appeals Council denied Plaintiff's request for review. *Id.* at 1–7. Plaintiff then appealed the Commissioner's final decision to this Court pursuant to Section 405(g) of the Social Security Act on April 27, 2023. ECF No. 1 (Complaint).

C. *The ALJ's Decision*

The ALJ issued a decision on February 2, 2022, concluding that Plaintiff was not disabled and thereby affirming the denial of his benefits. AR at 16–31. As required by regulation, the ALJ's decision followed a five-step process to assess Plaintiff's alleged disability. Under this five-step process, the Commissioner determines:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment, or combination of impairments;
> (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. § 416.920(a)(4)(i)–(v)).[3] "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four."

---

[3] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

*Id.* At step five, the burden shifts "to the Commissioner to show there is other work that the claimant can perform." *Id*.

At the first step, if Plaintiff is found to be currently engaged in "substantial gainful activity, [the ALJ] will find that [Plaintiff is] not disabled." 20 C.F.R. § 416.920(a)(4)(i). At the second step, "[i]f [Plaintiff does] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [Plaintiff is] not disabled." *Id*. § 416.920(a)(4)(ii). At the third step, "[i]f [Plaintiff] ha[s] an impairment(s) that meets or equals one of [the] listings in [20 C.F.R. Part 404, Subpart P, App. 1] and meets the duration requirement, [the ALJ] will find that [Plaintiff is] disabled." *Id*. § 416.920(a)(4)(iii). At the fourth step, "[i]f [Plaintiff] can still do [his] past relevant work, [the ALJ] will find that [Plaintiff is] not disabled." *Id*. § 416.920(a)(4)(iv). At the fifth step and final step, "[i]f [Plaintiff] can make an adjustment to other work, [the ALJ] will find that [Plaintiff is] not disabled. If [Plaintiff] cannot make an adjustment to other work, [the ALJ] will find that [Plaintiff is] disabled." *Id*. § 416.920(a)(4)(v).

The ALJ followed this five-step process by first concluding that Plaintiff had not engaged in any substantial gainful activity since March 27, 2020, the alleged disability onset date. AR at 18. At the second step, the ALJ indicated that Plaintiff's mental impairments significantly limited his ability to perform basic work activities and constituted "severe impairments" under 20 C.F.R. § 416.909. *Id*. at 19. Although the treatment record and medical file indicated the presence of some physical diagnoses—including COVID-19, multifocal pneumonia, and hypertension—the ALJ found that they had not produced "any significant or ongoing symptomology" which persisted for the minimum duration of twelve months. *Id.*; 20 CFR

404.1509. The ALJ therefore concluded that any physical impairments suffered by Plaintiff were not severe. AR at 19.

At step three, the ALJ considered Plaintiff's severe mental impairments and concluded that they did not rise to the level of severity of any one of the impairments in the Listing of Impairments. *Id.*; 20 C.F.R. Part 404, Subpart P, App. 1. The ALJ considered listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders) and found that Plaintiff's "mental impairments d[id] not meet or medically equal the criteria" for those listings. AR at 20.

When making this determination, the ALJ considered the "paragraph B" criteria found in 20 C.F.R. § 416.920a(c)(3) and determined that Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. at 20–21. Because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied. *Id*. at 21.[4] The ALJ also found that the "paragraph C" criteria were not satisfied because the ALJ did "not find that the claimant has achieved only marginal adjustment, as he does not show evidence of significant deterioration when faced with changes or routine demands." AR at 22.[5]

---

[4]  To satisfy the paragraph B criteria, the mental impairments must result in extreme limitation of one, or marked limitation of two, of the four areas of mental functioning. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00 A(2)(b). The four areas of mental functioning are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id*. An extreme limitation is an inability to function in the area independently, appropriately, effectively, and on a sustained basis. *Id*. § 12.00 F(2)(e). A marked limitation is a seriously limited ability to function in the area independently, appropriately, effectively, and on a sustained basis. *Id*. § 12.00 F(2)(d).

[5]  To satisfy the paragraph C criteria, the claimant's mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00 G(2)(a). The criterion in C1 is satisfied when the

6

Because the ALJ determined that Plaintiff did not have an impairment that met or equaled any in the Listing of Impairments, the ALJ went on to step four and assessed Plaintiff's residual functional capacity ("RFC"). AR at 22. The ALJ determined that Plaintiff was able to perform a full range of work at all exertional levels but with some non-exertional limits. *Id*. With respect to Plaintiff's mental impairments, the ALJ imposed the following restrictions:

> the [Plaintiff] is limited to simple, routine, repetitive tasks, and can make simple work-related judgments and decisions. He can understand, remember, and carry out only short and simple instructions, and can have no more than occasional changes in a routine work setting. He can perform goal-oriented work, but not fast-paced work. He is limited to occasional interaction with co-workers and supervisors, and no interaction with members of the general public. He can perform no work in tandem with others or in close proximity to others. He will need to be off task 10% of the workday.

*Id*. In reaching this conclusion, the ALJ gave great weight to the ability of Plaintiff to perform "a wide and varied range of activities of daily living" such as his ability to "vacuum, wash clothes, fix things around the house, dust, clean windows, touch up paint, drive to the pharmacy, pick up groceries, exercise in his basement, walk his dog, see friends and family, go out to restaurants with his wife, and watch television with his children." *Id*. at 26. The ALJ determined that the opinion of the state agency psychological advisors that Plaintiff could "perform unskilled work on a sustained basis" and had "mild limitation in the ability to understand, remember, and apply information; mild limitation in the ability to interact with others; moderate limitation in concentrating, persisting, and maintaining pace; and moderate limitation in the ability to adapt or

---

evidence shows that the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of his or her mental disorder. *Id*. § 12.00 G(2)(b). The criterion in C2 is satisfied when the evidence shows that, despite this treatment, the claimant has achieved only marginal adjustment. *Id*. § 12.00 G(2)(c). "Marginal adjustment" means that the claimant has minimal capacity to adapt to changes in environment or to demands that are not already part of their daily life; for example, the claimant may be unable to function outside of his or her home without substantial psychosocial supports, or may experience repeated episodes of deterioration which would make it difficult to sustain work activity over time. *Id*.

7

manage himself" was "partially persuasive." *Id*. at 27. The ALJ found that the limitation to unskilled work was supported by the record but that Plaintiff had "moderate, rather than mild, limitations in understanding, remembering, and applying information and in interacting with others." *Id*. The ALJ gave little weight to the opinion of psychiatric consultative examiner, Dr. Paul Spencer Herman, because his conclusion that Plaintiff had no limitation with respect to his ability to understand, remember, and apply simple directions and instructions was not supported by Plaintiff's need for ongoing treatment and his complaints of symptoms. *Id*. at 28. The ALJ found the opinion of medical consultative examiner Dr. Nahesi Lambert-Doorn, that Plaintiff had no physical limitation, to be consistent with Plaintiff's lack of any ongoing physical symptoms. *Id*. The ALJ was not persuaded by Dr. Deptula's finding that Plaintiff is significantly limited in his ability to function independently and to handle work related stresses. *Id*. The ALJ found those findings to be inconsistent with Dr. Deptula's own notes which "repeatedly indicate that the claimant was stable, functioning well overall, and was able to perform a wide range of activities of daily living." *Id*. Finally, the ALJ was persuaded by the opinion of Dr. Fischetti, who opined that Plaintiff functioned well with respect to his activities of daily living and interacting in small groups because that opinion was consistent with Plaintiff's own testimony. *Id*. at 28–29. Upon consideration of the entire record, the ALJ found that Plaintiff "would be limited to unskilled work with limited interaction with others, but that he would not be rendered totally disabled." *Id*. at 29. The ALJ then relied on impartial vocational expert testimony to conclude that Plaintiff was unable to perform any past relevant work as defined by 20 C.F.R. § 404.1565. *Id*. Therefore, the ALJ had to proceed to step five to determine whether Plaintiff could perform other work available in the national economy. *Id*.

At step five, the ALJ found that Plaintiff could perform jobs available in the national economy based on his age (52 years old at the time of the hearing), education, work experience,

and RFC. *Id.* at 30. Because Plaintiff was subject only to non-exertional limitations, the ALJ consulted section 204.00 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, to guide her decision-making at this step. *Id*. The ALJ also relied on the vocational expert's testimony regarding the types of jobs Plaintiff could perform with his non-exertional limitations and the approximate number of such jobs available in the national economy. *Id*. The vocational expert testified that given Plaintiff's age, education, work experience, and RFC, he would be able to perform the requirements of representative occupations such as meat clerk, linen room attendant, and hospital cleaner. *Id*. Adopting the findings of the vocational expert, the ALJ found that Plaintiff could make a successful adjustment to other work and therefore was "not disabled." *Id*. at 31.

## **LEGAL STANDARD**

When a plaintiff challenges an ALJ's decision as unsupported by substantial evidence, as Plaintiff does here, the Court must "conduct a plenary review of the administrative record" and determine "whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence." *Rucker v. Kijakazi*, 48 F.4th 86, 90–91 (2d Cir. 2022). "The substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022). But the standard is "not merely hortatory: It requires relevant evidence which would lead a reasonable mind to concur in the ALJ's factual determinations." *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022). The Court is therefore "required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Schillo*, 31 F.4th at 74. Once an ALJ has made findings of fact, however, the Court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (emphasis in original). Put another way, "[i]f evidence is susceptible to more than one rational interpretation,

9

the Commissioner's conclusion must be upheld." *Id.*  Although an ALJ is not required to "reconcile[]" "every conflict in [the] record," the ALJ must describe "the crucial factors in any determination . . . with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).

## DISCUSSION

Plaintiff contends that the ALJ committed reversible error when she found that Plaintiff was capable of performing full-time work despite his mental impairments.  ECF No. 10-1 at 4. Specifically, Plaintiff argues that:  (1) the ALJ's RFC finding "was not supported by the evidence," and (2) the ALJ adopted "demonstrably unreliable vocational expert testimony." *Id*. at 15, 21.  For the reasons discussed below, the Court finds that the ALJ did not err in these assessments and therefore grants the Commissioner's cross-motion for judgment on the pleadings.

Plaintiff first argues that the "medical evidence does not support" the ALJ's assessment that Plaintiff suffered moderate limitations in interacting with others and in adapting or managing himself.  *Id*. at 16.  In particular, Plaintiff argues that the ALJ did not give enough weight to the opinion of Dr. Deptula, who "opined that [Plaintiff] retained poor to no ability to deal with the public and retained poor to no ability to deal with work stresses, function independently; and understand, remember, and carry out detailed but not complex job instructions." *Id*.  The Court disagrees for several reasons.  As an initial matter, "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo*, 31 F.4th at 78.  Therefore, a discrepancy between the RFC finding and Dr. Deptula's opinion would not itself render the ALJ's determination erroneous.  Indeed, "[a]n RFC finding is administrative in nature, not medical, and its

determination is within the province of the ALJ." *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021).

Further, the ALJ's RFC finding is, contrary to Plaintiff's assertion, largely consistent with Dr. Deptula's opinion. Dr. Deptula indicated that Plaintiff could not deal with the public nor work in tandem with others, but could understand, remember, and carry out simple job instructions. AR at 748. The ALJ's RFC finding restricted Plaintiff from dealing with the public and working in close proximity with others and limited Plaintiff to carrying out only short and simple instructions. *Id*. at 22.

In addition, where the ALJ's RFC finding differed from Dr. Deptula's opinion, such as an inability to deal with work stresses or function independently, the RFC was nevertheless supported by substantial evidence. *See Schillo*, 31 F.4th at 74. Plaintiff argues that "the ALJ cherry picked certain routine findings in Dr. Deptula's extensive notes and decided to completely ignore the actual findings that support the opinion." ECF No. 10-1 at 16. The Commissioner argues "that the ALJ did not cherry-pick only evidence that was unfavorable to Plaintiff's claims, but instead discussed and evaluated evidence found throughout the record to support the RFC finding and the rejection of more restrictive limitations." ECF No. 13-1 at 21. I agree with the Commissioner. "That an ALJ does not give controlling weight to a particular medical opinion is not a basis for second-guessing the ALJ's conclusions." *Peets v. Kijakazi*, No. 21-3150-cv, 2022 WL 17725391, at *1 (2d Cir. Dec. 16, 2022). To the extent Dr. Deptula opined that Plaintiff was unable to deal with work stresses nor function independently, Dr. Deptula's opinion is contradicted by his own notes as well as other evidence in the record. Dr. Deptula noted that Plaintiff "has been doing well," "has been able to continue to remain behaviorally active," and is "capable of small tasks." AR at 767. Furthermore, Dr. DeLucia noted that Plaintiff reported "overall stability as far as mood and anxiety, is active, engaged in family life," and had no

11

significant complaints. *Id*. at 779. Finally, Dr. Deptula's opinion that Plaintiff is unable to function independently is belied by Plaintiff's ability to perform activities such as walking his dog, vacuuming the house, doing laundry, touching up paint, and going to the grocery store. *Id*. at 50–51; *see Ohrnberger v. Colvin*, No. 15-cv-2714, 2016 WL 4435222, at *10 (E.D.N.Y. Aug. 19, 2016) (finding the RFC for low stress work was supported, in part, by the claimant's daily activities, including making the bed, doing laundry, watching television, cooking, running errands, and caring for the family dog).

Plaintiff next argues that the ALJ's finding that Plaintiff would be off-task ten percent of the workday was "not rooted in any particular medical evidence or opinion." ECF No. 10-1 at 19. However, as a general matter, the ALJ does not have to point to a particular source for each of her RFC findings. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, [the ALJ] was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). Moreover, the ALJ pointed to Plaintiff's "lingering symptoms including forgetfulness and difficulty interacting with others," albeit "significantly improved," in finding that an allowance of ten percent of the workday for Plaintiff to be off-task to be appropriate. AR at 26, 767.

Finally, Plaintiff contends that the ALJ erred by adopting "demonstrably unreliable vocational expert testimony." ECF No. 10-1 at 21. Specifically, Plaintiff argues that he is not capable of performing two of the three representative occupations provided by the vocational expert—meat clerk and hospital cleaner—because of Plaintiff's inability to interact with the public. *Id*. Although Plaintiff's RFC specifically precludes any interaction with the public, the two occupations referenced do not require interaction with the public. With respect to the meat clerk occupation, although the description of meat clerk from the Dictionary of Occupation Titles

12

("DOT") includes "may take meat orders from customers," it does not indicate that taking orders is a required function of the occupation. *See* DOT § 222.684-010. Furthermore, the DOT occupational codes for meat clerk and hospital cleaner indicate that the occupations require only the minimum degree of functionality in relation to people.[6] *Id.* §§ 222.684-010, 323.687-010. Regarding the hospital cleaner occupation, the DOT description does not give any indication that the job requires interacting with others, let alone with the general public. *See* DOT § 323.687-010. The Court sympathizes with Plaintiff's argument that for someone who "suffered a psychotic break due to his fear and paranoia of contracting Covid-19," working in a hospital would be troublesome. ECF No. 10-1 at 22. However, the ALJ did not err in finding that, based on Plaintiff's age, education, work experience, and RFC, Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR at 30. Even if the Court does not include hospital cleaning jobs, the remaining meat clerk and linen room attendant occupations amount to over 70,000 jobs available in the national economy, a "significant" number. *Id.*; *see Pichardo v. Comm'r of Soc. Sec.*, 714 F. Supp. 3d 183, 195 (E.D.N.Y. 2024) (Though "[c]ourts have not established a bright line test as to the threshold number of jobs that is significant for the purposes of the [Social Security] Act," "courts have generally held that what constitutes a significant number is fairly minimal, and numbers between 9,000 and 10,000 jobs have typically been found to be sufficiently significant to meet the Commissioner's burden."); *cf. Stiffler v. O'Malley*, 102 F.4th 1102, 1108 n.1 (9th Cir. 2024)

---

[6] The middle three digits of the DOT occupational code are the Worker Functions ratings of the tasks performed in the occupation. *See Parts of the Occupational Definition*, Off. of Admin. L. Judges L. Libr., U.S. Dep't of Labor, https://perma.cc/6HHJ-B4PB (last visited November 20, 2024). A separate digit expresses the worker's relationship to data (fourth digit), people (fifth digit), and things (sixth digit). *Id.* Worker Functions involving more complex responsibility and judgment are assigned lower numbers in these three lists while functions which are less complicated have higher numbers. *Id.* For people, "8" is the highest number available. *Id.* The fifth digit corresponding both to the meat clerk and hospital cleaner occupations is "8." *See* DOT §§ 222.684-010, 323.687-010.

13

(finding that an ALJ's error in including an inappropriate occupation was harmless if the other identified occupations provided a significant number of available jobs). Furthermore, Plaintiff's ability to perform these jobs is consistent with the ALJ's observations that Plaintiff was able to perform activities such as walking his dog, vacuuming the house, doing laundry, touching up paint, and going to the grocery store. AR at 26.

In considering the record as a whole, the ALJ's opinion is amply supported by substantial evidence. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 220 (E.D.N.Y. 2021) (explaining that "the relevant question is not whether substantial evidence supports plaintiff's position, but whether substantial evidence supports *the ALJ's decision*" (emphasis in original)). The Court must therefore affirm the decision of the Commissioner.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the Commissioner's motion for judgment on the pleadings, *see* ECF No. 13-1, and DENIES Plaintiff's motion for judgment on the pleadings, *see* ECF No. 10-1. The Clerk of Court is respectfully directed to enter judgment and to close this case. The Court is temporarily issuing this Order to be available only to the parties. The parties are directed to file a joint motion to seal the appropriate portions of this Order, if necessary, on or before December 20, 2024. The Court will thereafter rule on any sealing motion, apply any appropriate redactions, and make this Order publicly available.

SO ORDERED.

                                             */s/ Hector Gonzalez*
                                             HECTOR GONZALEZ
                                             United States District Judge

Dated: Brooklyn, New York
       November 20, 2024